IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KELLY J. POLATIS,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER COMPELLING REOFFER OF PLEA AGREEMENT**<br><br>Case No. 2:10-cr-0364<br><br>Judge Clark Waddoups |

The court heard evidence at a hearing on December 7, 2012 relating to Defendant's

Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the

Defendant Due to Ineffective Assistance of Counsel [Dkt. No. 310]. After briefing on the issues

following the evidentiary hearing, the court heard oral argument on the motion on March 1,

2013. The court has carefully considered the parties' arguments at the hearing and in their briefs

and finds that Defendant has been deprived of his Sixth Amendment right to effective assistance

counsel in negotiating and deciding whether to accept the Government's plea agreement.

## I.       BACKGROUND

**Indictment and Plea Offer**

On May 5, 2010, Defendant was indicted for two counts of murder-for-hire. On

December 8, 2010, a grand jury returned a seventeen-count Superseding Indictment charging

Defendant with thirteen counts of murder-for-hire and four counts of tampering with a witness.

[Dkt. No. 86.] After trial, the jury convicted Defendant on ten counts of murder-for-hire and on all four counts of witness tampering. (Jury Verd. [Dkt. No. 247].)[1]

When Defendant was originally indicted, his trial counsel Lawrence Leigh[2] advised him verbally about his "bottom line" potential sentence under the sentencing guidelines, which he communicated as 20 to 24 years. On November 24, 2010, Mr. Leigh sent the lead prosecutor on the case, Ms. Veda Travis, an email with the subject line "Polatis Plea Offer" requesting that Ms. Travis let him know "what the government will offer to settle this case before trial." (Email of Nov. 24, 2010, Ev. Hrg. Def.'s Ex. A.) Ms. Travis is an experienced Assistant United States Attorney who has been with the U.S. Attorney's Office since 1999 working in the violent crime section for all but one year in which she was assigned to narcotics. Mr. Leigh followed up with Ms. Travis on December 6, 2010 whereupon she responded on December 7, 2010 with an offer of 151-188 months for a plea to one count of murder-for-hire. The plea offer read in relevant part as follows:

> At the present time, we are looking to supersede tomorrow. . . . That guideline range is 324-405 months, criminal history category I.

> I would be willing to go to the screening committee with an agreement whereby Mr. Polatis would plead guilty to only one count of murder-for-hire and we would agree that the judge would sentence him somewhere in the 151-188 month range. (We both could argue for whatever sentence within that range we want the judge to give.) . . .

> While I realize this is a significant sentence which will be difficult for Mr. Polatis to accept, I believe that if he were to go to trial, we would prevail and he could well be facing a life sentence, depending on how the issue of multiple counts is handled. And if he were to plead, he would receive credit for time served in this case and could receive 54 days off his sentence each year for good time.

---

[1] The court granted Defendant's renewed Motion for Judgment of Acquittal [Dkt. Nos. 238 and 271] after the verdict as to Count VIII of the Superseding Indictment, thus dismissing one of the ten murder-for-hire counts for which Defendant had been convicted. (*See* Mem. Dec. & Order dated Aug. 3, 2012, at 13-14 [Dkt. No. 305].)

[2] Mr. Leigh is an attorney in private practice who was appointed by the court to represent Defendant and who had substantial experience both prosecuting and defending criminal defendants, though never in a potential life sentence case, which this case become upon the return of the Superseding Indictment on December 8, 2010.

> As I mentioned, if Mr. Polatis is amenable, I would be willing to present this offer to our screening committee. I need to let you know that the screening committee will have the final say on the deal—I do not have that authority.

(Email of Dec. 7, 2010, Ev. Hrg. Def.'s Ex. A.)

At oral argument the Government argued, and Ms. Travis's colleague Carlos Esqueda in the U.S. Attorney's Office testified, that the plea offer was made under the framework of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure (a key element of which is that Defendant would waive his right to appeal). Ms. Travis and Mr. Esqueda, who was a member of the Screening Committee that would ultimately have to sign off on the plea offer if Defendant accepted it, discussed the terms of the plea offer before Ms. Travis communicated it to Mr. Leigh. Mr. Esqueda testified that he told Ms. Travis that the offer was "worthy of presenting to the Screening Committee" as long as the mechanisms of Rule 11(c)(1)(C) were in place. (Tr. Ev. Hrg. Dec. 7, 2012, at 151 [Dkt. No. 328].) Ms. Travis testified that as a general matter she would not go to the Screening Committee with an offer that the committee would reject and that if Defendant had accepted the plea offer, she would have drafted a memorandum for the Screening Committee presenting the offer for final approval. She testified that if Defendant had accepted the plea offer from her email of December 7, 2010 (modified as described below on December 8), she would in fact have been willing to present that plea to the Screening Committee. Mr. Esqueda testified that although he discussed the offer with Ms. Travis before she sent it to Mr. Leigh, and although he personally viewed it as a "significant sentence," he thought there was a possibility that the broader Screening Committee might find the range too low. (*Id.* at 150, 152.)

**Treatment of Plea Offers in the U.S. Attorney's Office**

Mr. Esqueda explained at the evidentiary hearing, and the Government argued at oral argument, that if a plea offer of the kind Ms. Travis made to Mr. Leigh were accepted by a defendant, the offer would still not be binding on the Government at that time because it would

then have to be approved by the Screening Committee. In fact, Mr. Esqueda testified that "[w]hat an AUSA does in its negotiations with the defense attorney is not an offer." (*Id.* at 148.) The word "offer" is a "common term" in this context,[3] Mr. Esqueda conceded, but he explained that "we [the U.S. Attorney's Office] use the term offer to mean something that is set in stone or during the negotiations of a case." (*Id.* at 149.) "An offer is only authorized after it has been screened or as it exists today as it has been approved by their section chief." (*Id.* at 148.) According to Mr. Esqueda, Assistant U.S. Attorneys should make a "reasonableness evaluation" before they submit any proposal for the resolution of the case to the Screening Committee (as Ms. Travis testified was her general practice) but in his experience "that is not always done" because "there are times where AUSAs do send plea memos to the screening committee with no expectation of them being granted" simply because defense counsel requested it. (*Id.* at 149-150.) But Mr. Esqueda's recollection was that Ms. Travis's offer in this case was not the kind of offer that she considered unreasonable and merely wanted to present to the Screening Committee upon defense counsel's request (and Ms. Travis implied that she would not do that on principle).

When asked whether he ever became aware that Defendant had rejected the plea offer, Mr. Esqueda went so far as to testify that "[t]here was never a plea offer to reject." (*Id.* at 153.) When asked to confirm whether it was his testimony that "there was no plea offer to reject," Mr. Esqueda testified "I'm saying that there is no *formal* plea offer to reject." (*Id.* at 154 (emphasis added).) But after the Screening Committee approves of an offer that a defendant has indicated is acceptable, Mr. Esqueda explained, then "the offer is formally made to defense counsel" and if "the defendant says I accept, then the government is bound by that agreement." (*Id.* at 149.)

---

[3] Mr. Esqueda went on to explain that "the term offer could mean one of two things, a formal plea offer, or the beginnings or the ongoing negotiations of a particular case." (Tr. Ev. Hrg. Dec. 7, 2012, at 154 [Dkt. No. 328].)

**Superseding Indictment and Discussion of the Plea Offer**

On the same day he received Ms. Travis's email communicating the plea offer, Mr. Leigh drafted and sent a letter to Defendant enclosing Ms. Travis's email and stating

> Enclosed is the government's offer in the form of an email today from Veda Travis. I will respond by indicating that we will consider it, and then I will talk to you further. As this offer seems to be along the lines of the kind of offer we thought we would get, I think we already have discussed the pros and cons of accepting an offer like this. At any rate, here it is in black and white. This may make your decision a relatively simple one.

(Letter of Dec. 7, 2010, Ev. Hrg. Def.'s Ex. B.) Mr. Leigh never confirmed with Defendant whether he received the letter but assumed he had. Defendant testified that he never received it.

On December 8, 2010, Ms. Travis sent a follow-up email explaining that she had made a mistake in her email the previous day because Defendant would need to plead to two counts of murder-for-hire and not one. (Email of Dec. 8, 2010, Ev. Hrg. Def.'s Ex. C.) She testified that this was necessary in order to accommodate a sentence of 151-188 months. The follow-up email did not include a disclaimer similar to the one in the initial email ("I need to let you know that the screening committee will have the final say on the deal—I do not have that authority."). Mr. Leigh responded by email to say "No problem, I have not been able to discuss this with him yet." (Email of Dec. 8, 2010, Ev. Hrg. Pl.'s Ex. 7.) As promised, later that day, the Government obtained the Superseding Indictment [Dkt. No. 86] from the grand jury. On December 15, 2010, Defendant filed two motions to dismiss. [Dkt. Nos. 90, 91.] After Defendant's arraignment hearing on December 20, 2010 Ms. Travis sent Mr. Leigh an email referring to the motions to dismiss as evidence that Defendant's "intentions have been to litigate this case with the United States rather than negotiate. As such, the offer is hereby withdrawn." (Email of Dec. 20, 2010, Ev. Hrg. Pl.'s Ex. 8.)

Between December 8 and December 15, 2010, Mr. Leigh visited Defendant in the adult detention center and discussed the Superseding Indictment and the plea offer. Mr. Leigh told Defendant that the offer was 151 to 188 months for two counts of murder-for-hire. Mr. Leigh does not remember telling Defendant that the defense would be able to argue for the low end of that range and the Government could argue for the high end. But Mr. Leigh remembers telling Defendant that it would be a harder decision about whether to accept or reject the plea offer if the government "had offered something like five years on an obstruction of justice count." (Tr. Ev. Hrg. Dec. 7, 2012, at 14 [Dkt. No. 328].) Mr. Leigh did not tell Defendant not to take the offer but he told Defendant that in his opinion the case was triable. Mr. Leigh also testified confidently that he did not then or at any time thereafter discuss with Defendant the sentencing guidelines relating to the Superseding Indictment, which Ms. Travis had mentioned in her email of December 7, 2010 (referring to "324 to 405 months, criminal history category I"), and that he continued under the assumption that Defendant had read Mr. Leigh's letter and the attached plea offer email.

**Ineffective Assistance of Counsel**

Instead of discussing with Defendant the sentencing guidelines applicable under the Superseding Indictment (324 to 405 months) or that Defendant would be able to argue for the low end of the plea offer range of 151 to 188 months if he chose to accept the plea, Mr. Leigh discussed why he thought the case was triable. Specifically, Mr. Leigh said that the Government would have to prove both an intent to kill and a substantial step, neither of which he thought the Government could show under the facts. Mr. Leigh would present an intoxication defense at trial, obviating Defendant's specific intent. He also told Defendant that based on having reviewed a pattern jury instruction on murder-for-hire, he believed that murder-for-hire would

require "a bargain for exchange and exchange of consideration of contractual terms." (*Id.* at 26.) And so Mr. Leigh discussed with Defendant "the fact that the government didn't get what they bargained for here. They didn't get any money up front." (*Id.* at 27.)

Even after the trial and jury verdict in July 2011 convicting Defendant of ten counts of murder-for-hire and on all four counts of witness tampering, Mr. Leigh did not immediately assess the applicable sentencing guidelines. Defendant eventually asked Mr. Leigh about them and Mr. Leigh realized he would need to review them to be able to discuss them accurately with Defendant. By October, after work on post-trial motions was largely out of the way, Mr. Leigh finally looked into the sentencing guidelines and discovered he had likely never calculated them based on the guidelines applicable to the charges in the Superseding Indictment. Mr. Leigh testified that "to this day" he does not know why he did not perform the calculations "but I didn't do it." (*Id.* at 16.) Mr. Leigh further testified that upon performing the calculation he realized "it could be worst case scenario he could be facing a life sentence which made it even all the worse if this was a mistake that yeah I had made." (*Id.* at 19.)

Defendant testified that when Mr. Leigh discussed the Government's plea offer with him between December 8 and December 20, 2010, he did not understand what his risk exposure was under the sentencing guidelines applicable to the charges in the Superseding Indictment. Defendant further testified that before receiving the plea offer Mr. Leigh had told him that he "had an extremely good chance of winning this case" and so he hoped the Government did not offer Defendant just an obstruction of justice charge with a five year sentence because that would make it a tough decision as to whether to plead. (*Id.* at 72.) Defendant related that when Mr. Leigh discussed the plea offer with Defendant, he said "you don't have to worry about a tough decision . . . because it is 150 something [months] to 180 something [months]." (*Id.*) According

to Defendant, it was not until after trial and after Mr. Leigh had worked through post-trial motions that Defendant learned from Mr. Leigh that he was facing a prison term of his natural life under the applicable sentencing guidelines. Ultimately, Defendant testified that if he had known at the time of the plea offer that he faced life in prison under the sentencing guidelines relating to the charges in the Superseding Indictment and that he could be convicted even though he had not paid any money to the undercover agent posing as a hit man, he would have accepted the plea offer of 151 to 188 months, with the opportunity to argue for the low end, in exchange for pleading guilty to two murder-for-hire charges.

## III. ANALYSIS

The discussions and interactions in the period of December 7, 2010 to December 20, 2010 between Defendant and his trial counsel about the Government's plea offer, together with trial counsel's approach at trial, amounted to ineffective assistance of counsel relating to the offered plea agreement. As a result, the court must compel the Government to reoffer the plea agreement to remedy the Constitutional defect.

### A. Right to Effective Assistance of Counsel in Plea Bargaining

The Sixth Amendment guarantees Defendant the right "to have the assistance of counsel for his defence." U.S. Const. amend. VI. "The right to counsel is the right to effective assistance of counsel." *Missouri v. Frye*, 132 S. Ct. 1399, 1404 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).[4] In *Frye*, the Supreme Court affirmed that a criminal defendant's right to effective assistance of counsel extends to the plea bargaining process. 132 S. Ct. at 1404 (finding that the defendant was deprived of effective assistance of counsel required by the

---

[4] "In giving meaning to the requirement, however, we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686.

Constitution when trial counsel allowed a plea offer "to expire without advising the defendant or allowing him to consider it"). "In today's criminal justice system," the *Frye* Court observed, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Id.* at 1407. Continuing, the Court reasoned that "[t]he potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties. In order that these benefits can be realized, however, criminal defendants require effective counsel during plea negotiations. Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him." *Id.* at 1407-08 (internal quotation marks and citations omitted).

The Supreme Court also simultaneously held in *Lafler v. Cooper* that assistance of counsel was constitutionally ineffective when a defendant's trial counsel advised him "to reject the plea offer on the grounds he could not be convicted at trial" based on counsel's reliance on "an incorrect legal rule." 132 S. Ct. 1376, 1383-1384 (2012) (explaining that the defendant had rejected plea offers "allegedly after his attorney convinced him that the prosecution would be unable to establish his intent to murder . . . because [the victim] had been shot below the waist"). The *Lafler* Court emphasized that "the two part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 1384 (quoting *Hill v. Lockhart*, 474 U. S. 52, 58 (1985)). "The performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688).[5] "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[5] In *Lafler* all parties agreed that the defendant's trial counsel's performance "was deficient when he advised respondent to reject the plea offer on the grounds he could not be convicted at trial" and the Supreme Court therefore did not analyze this prong of the *Strickland* test. *Id.* at 1384.

result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). In *Hill*, the defendant pleaded guilty based on defective counsel from his attorney. *Hill*, 474 U.S. at 59. In *Lafler*, as here, the defendant rejected plea offers based on deficient performance of counsel and faced significantly more jail time based on the convictions at trial. *Lafler*, 132 S. Ct. at 1385 ("Having to stand trial, not choosing to waive it, is the prejudice alleged.").

## B.    Constitutionally Deficient Performance

As noted above, "[t]he performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). The *Strickland* Court clarified that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. In analyzing trial counsel's performance in this case, the court acknowledges that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.[6] And the "proper measure of attorney performance," as referred to in *Strickland*, is not precisely defined outside of the requirement to comply with "prevailing professional norms." At a minimum, however, it is obvious that "it is objectively unreasonable for defense counsel advising the defendant on a plea offer to grossly underestimate the defendant's sentencing exposure in the event of a guilty verdict at trial." *Ortega v. United States*, No. 02-cr-348-LTS-GWG, 2012 U.S. Dist. LEXIS

---

[6] The court is mindful that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Strickland*, 466 U.S. at 690; *accord Johnson v. United States*, 860 F. Supp. 2d 663, 780 (N.D. Iowa 2012) (citing *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 742 (2011) for the proposition that caution is necessary in "reviewing the performance of counsel at the pretrial stage of the proceedings, when neither the prosecution nor the defense may know with much certainty what course the case may take").

88727, at *35 (S.D.N.Y. June 27, 2012) (internal quotation marks and citations omitted). In advising a defendant in the plea bargaining process, "counsel *must communicate to the defendant the terms of the plea offer*, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Id.* at *32 (quoting *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (emphasis added)). The court agrees that communication of all of the terms of the plea offer should be a bare minimum for the "objective standard of reasonableness" governing defense counsel's representation during the plea bargaining process.[7]

In this case, Mr. Leigh did not "grossly underestimate the defendant's sentencing exposure in the event of a guilty verdict at trial." *Id.* at *35. Rather, Mr. Leigh testified that when presenting the plea offer to Defendant he did not also discuss the sentencing exposure he faced under the Superseding Indictment and, in fact, never even calculated the sentencing guidelines applicable to those charges until long after Defendant was convicted at trial. In *Ortega*, the court ultimately found that counsel's advice in the plea negotiation, "even if not ideal in its presentation, was sufficient to allow [the defendant] *to compare the likely sentencing exposure he faced if he went to trial compared with the likely sentencing exposure he faced if he pled without an agreement*." *Id.* at *38 (emphasis added). Here, the court must evaluate the Defendant's inability to make such a comparison (between the sentencing range in the plea offer and the sentencing range arising from the sentencing guidelines applicable to the Superseding Indictment) based on counsel's performance in dealing with the plea offer.

---

[7] This is, of course, consistent with *Frye*'s holding that counsel's performance is constitutionally defective where a plea offer is allowed to expire without defendant knowing about it or considering it.

*1.*        *Knowledge of Comparative Sentence Exposure*

The Tenth Circuit has recently examined the issue of constitutionally defective performance of counsel at the plea bargaining stage in *United States v. Washington*, 619 F.3d 1252 (10th Cir. 2010).[8] In assessing whether the defendant had suffered from ineffective assistance of counsel in the sentencing process, the *Washington* court addressed the implications of defense counsel's failure to understand, communicate, or effectively advise on the exposure a defendant faces under the sentencing guidelines at the plea bargaining stage for comparison. In doing so, the Tenth Circuit articulated a helpful measurement for counsel's performance at the plea bargaining stage: "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Id.* at 1259-60 (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)). This measure for counsel's performance at the plea bargaining stage—ensuring that the defendant has this comparative knowledge—is particularly instructive in this case.[9]

Moreover, two state cases informed this measure of performance as articulated in *Day* and specifically emphasized by the Tenth Circuit in *Washington*; both of these cases illustrate the "prevailing professional norms," *Strickland*, 466 U.S. at 688, with which counsel must comply at this stage of the process. As cited in *Day*, 969 F.2d at 43, the Maryland Court of Appeals found a constitutionally deficient performance of counsel at the plea bargaining stage where counsel

---

[8] In *Washington*, the defendant appealed claiming ineffective assistance of counsel at both the plea bargaining stage and the sentencing stage. He alleged that his trial counsel had advised him not to accept a plea offer of a ten-year sentence and that he was convicted at trial and then sentenced to a total of 120 years. 619 F.3d at 1254-55. As to the allegations of ineffective assistance of counsel at the plea bargaining stage, the Tenth Circuit held that "[e]ven assuming that defense counsel's performance was deficient, however, the district court's factual finding that the government never made a firm plea offer finds adequate support in the record. Thus, Mr. Washington cannot make the requisite *Strickland* showing that but for [trial counsel's] ineffective assistance, he would have plead guilty." 619 F.3d at 1256-57. In other words, regardless of the deficiency of trial counsel's *performance*, defendant could not satisfy the second prong of the *Strickland* test—the showing of resulting *prejudice*.

[9] Although decided before *Frye* and *Lafler*, *Washington*'s analysis is grounded in *Hill* and *Strickland*, and the Tenth Circuit adopted this particular measure from *Day*.

failed to advise the defendant of the mandatory 25-year to life sentence he faced under the applicable guidelines when presented with an offer to plead guilty to a lesser offense for a sentence of 10 years. *Williams v. State*, 605 A.2d 103, 111 (Md. 1992) (overturning the appellate court and remanding to the trial court so that defendant could accept the plea offer or, if defendant decided not to accept the reoffered plea agreement, to reinstate the original conviction).

Similarly, as cited in *Day*, the Pennsylvania Superior Court found that trial counsel's performance had been deficient in not advising defendant that a plea offer for a three-year maximum sentence was attractive where the risk exposure was ten to forty years if convicted at a trial in which the chances of acquittal were slim. *Commonwealth v. Napper*, 385 A.2d 521, 524 (Pa. Super. 1978) (reversing the trial court's denial of defendant's post-conviction petition alleging ineffective assistance of counsel). The *Napper* court observed that "[d]efense counsel has a duty to communicate to his client, not only the terms of a plea bargain offer, but also the relative merits of the offer *compared to the defendant's chances at trial*." *Id.* (emphasis added). Quoting the 1967 edition of Amsterdam, Segal and Miller's *Trial Manual for the Defense of Criminal Cases*, the *Napper* court further explained that the decision about accepting or rejecting a plea offer is so crucial that "a considerable amount of persuasion" might be necessary "*to convince the client to plead guilty in a case where a not guilty plea would be totally destructive.*" *Id.* (emphasis as supplied by *Napper* court). The court does not believe that the professional standard to which counsel must adhere in advising defendants at the plea or plea bargaining stage has lessened in intervening years.

To the contrary, the District Court for the Eastern District of Tennessee recently confirmed that such a standard continues to apply at the plea bargaining stage in *United States v.*

*Wolfe*, No. 2:11-cr-33-JRG, 2012 U.S. Dist. LEXIS 75369 (E.D. Tenn. May 31, 2012). In *Wolfe*,

before the return of a superseding indictment,[10] the Government "extended a proposed plea

agreement" to the defendant in which he would plead guilty to one drug charge and one

possession of firearm charge and the Government would dismiss the remaining three counts. *Id.*

at *23. The defendant argued ineffective assistance of counsel because he was never told "how

federal sentences are determined" and, more importantly for the present case, was not advised

"of the Sentencing Guidelines range which would apply to his case." *Id.* at *24. Although his

counsel "did tell him that Count Five carried a mandatory minimum," defendant testified that his

counsel "never told him about the potential difference in penalties if he accepted the plea

agreement." *Id.* at *24-*25.[11] Citing *Lafler*, *Strickland* and other leading cases, the *Wolfe* court

explained that "[i]n a system dominated by sentencing guidelines, we do not see how sentence

exposure can be fully explained without completely exploring the ranges of penalties under

likely guideline scoring scenarios, given the information available to the defendant and his

lawyer at the time." *Id.* at *30 (quoting *Smith v. United States*, 348 F.3d 545, 552 (6th Cir.

2003)). On this basis, the *Wolfe* court found that counsel's representation of the defendant in the

plea negotiations was "constitutionally deficient." *Id.* at 33.

    A comparative view of sentencing exposure is also missing in this case. Although Mr.

Leigh discussed the "bottom line" of 151-188 months from the Government's plea offer with

---

[10] In the superseding indictment, one charge was changed to refer to use of an AK-47 assault rifle in furtherance of a drug trafficking offense, which carried the enhanced penalty of "a ten year mandatory minimum to a maximum of life imprisonment to run consecutively to the underlying drug offense." *Id.* at *3.

[11] Defense counsel testified that he reviewed the applicable sentencing guidelines with defendant (though "he could not recall how the range was calculated or what the range was," *id.* at *27) at the detention center after the prosecutor, just prior to the return of the superseding indictment, had made an oral offer to him that was the same as the proposed (written) plea agreement but which dropped the requirement to cooperate and the assault rifle charge. *Id.* at *25-*26 & n.16. He claimed that he recommended that the defendant accept the offer but the defendant rejected it. *Id.* at *26. But the court noted that "the testimony of counsel conflicts dramatically with that of defendant and his mother" and ultimately found "the testimony of defendant and his mother far more credible than that of [defense counsel]." *Id.* at 31.

Defendant, the record shows that he did not calculate or discuss with Defendant his actual sentencing exposure under the Superseding Indictment. Mr. Leigh regretfully testified that "this is a puzzle to me even to this day as to why I didn't do it, but I didn't do it." (Tr. Ev. Hrg. Dec. 7, 2012, at 16 [Dkt. No. 328].)[12] And yet the applicable sentencing exposure under the Superseding Indictment was more than twice what Defendant faced under the plea offer. Mr. Leigh's performance in his representation during this plea negotiation therefore deprived Defendant of any "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer," which was "crucial to [his] decision whether to plead guilty." *Washington* at 1259-60. The representation was constitutionally deficient, as in *Wolfe*, because by failing to discuss the applicable sentencing guidelines under the Superseding Indictment, Defendant's counsel essentially "never told him about the potential difference in penalties if he accepted the plea agreement." 2012 U.S. Dist. LEXIS 75369 at *24-*25. As in *Williams* and *Napper*, Defendant could not assess "the relative merits of the offer compared to [his] chances at trial." *Napper*, 385 A.2d at 524.

It is true that Mr. Leigh promptly forwarded the Government's plea offer email to Defendant in a letter that he instructed his staff to send to Defendant in the detention center and assumed from that point onward, without ever verifying, that Defendant received it. But Defendant claims he never received the letter and, although the court is aware that, as the Government points out, this testimony is self-serving and uncorroborated, the court finds that even if Defendant had received the letter, he would have still needed guidance from Mr. Leigh in understanding it. "If a plea bargain has been offered, a defendant has the right to effective

---

[12] Mr. Leigh is a respected and experienced attorney in the community. By this caveat, the court wishes to express that a constitutional deficiency in performance of representation is not limited to the types of genuinely bad lawyers on display in some of the cited decisions. Unfortunately, it can occasionally occur where counsel is dedicated and normally conscientious in all aspects of his or her representations, as is the case here.

assistance of counsel in considering whether to accept it." *Lafler*, 132 S. Ct. at 1387. Effective assistance of counsel in considering it would have entailed, in this case, discussion with counsel of the applicable guidelines under the Superseding Indictment and their comparative implications. It is not enough for a defendant to merely read about the terms of an offer on his own; that is not effective assistance of counsel.

Additionally, Mr. Leigh did not even convey all of the terms of the plea offer to Defendant when he informed him of the offered sentencing range. Specifically, he did not explain that part of the plea offer was that Defendant would be able to argue for the low end of the offered range. The court finds this to be a material term. As a result, because at the very least "counsel must communicate to the defendant the terms of the plea offer" in advising during a plea negotiation, *Ortega*, 2012 U.S. Dist. LEXIS 88727, at *32, Mr. Leigh's performance in this instance fell short of the "objective standard of reasonableness" required by *Strickland*.

### 2. *Incorrect Legal Principle*

Defendant draws an explicit comparison between Mr. Leigh's apparently mistaken opinion about the Government's burden at trial, which he expressed to Defendant in relating his opinion that the case was triable,[13] and the facts in *Lafler*. (Def.'s Mem. Supp. Mot. Compel 28 [Dkt. No. 332].) That is, in *Lafler* counsel advised the defendant to reject plea offers based on counsel's incorrect view that "the prosecution would be unable to establish [the defendant's] intent to murder . . . because [the victim] had been shot below the waist." *Lafler*, 132 S. Ct. 1383.

---

[13] Mr. Leigh told Defendant that the Government would have to prove that consideration was given in order to convict him for murder-for-hire. Mr. Leigh explained to Defendant that he thought the Government would not be able to meet this burden because of "the fact that the government didn't get what they bargained for here. They didn't get any money up front." (Tr. Ev. Hrg. Dec. 7, 2012, at 27 [Dkt. No. 328].) The court addressed Defendant's counsel's view about this in the context of ruling on Defendant's Renewed Motion for Acquittal after the jury returned its verdict, finding that although the law on this principle is not firm in the Tenth Circuit, "it is clear that the evidence presented at trial was sufficient to allow a rational fact-finder to conclude, beyond a reasonable doubt, that such an agreement was made" in spite of money not actually changing hands. (*See* Mem. Dec. and Order dated Aug. 3, 2012, at 37 [Dkt. No. 305].)

But because the court has already found Mr. Leigh's representation of Defendant in the plea negotiation process to be constitutionally defective based on his failure to convey all of the material terms of the plea offer to Defendant and to ensure that Defendant had an understanding of the comparative sentence exposure between standing trial and accepting the plea offer, the court need not address Defendant's further arguments about Mr. Leigh's ineffective representation.

## C.    *Strickland* **Prejudice**

*Strickland*'s "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Lafler*, 132 S. Ct. at 1384 (quoting *Hill*, 474 U. S. at 59). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.* at 1387. The *Lafler* Court explained that "[i]n these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385.

At oral argument, the Government argued that Defendant was going "a bridge too far"[14] by investigating these outcomes; pursuing such queries, it argued, necessarily constituted "absolute speculation." But the Supreme Court in *Frye* and *Lafler* affirmed the necessity of entertaining speculation about the "reasonable probability" of these outcomes to apply the

---

[14] Using a passionate appeal to the World War II military action referred to as Operation Market Garden.

prejudice prong of the *Strickland* test in the context of determining whether Defendant was afforded effective assistance of counsel in the plea negotiation.[15] After all, the *Lafler* Court identified "[h]aving to stand trial, not choosing to waive it" as "the prejudice alleged," 132 S. Ct. at 1385, clarifying further that the defendant "went to trial rather than accept a plea deal, and it is conceded this was the result of ineffective assistance during the plea negotiation process," *id.* at 1386. The Court observed that "the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id.* Here, Defendant experienced both as a result of Mr. Leigh's constitutionally defective performance at the plea bargain stage.

The court is persuaded that the *Strickland* prejudice prong is satisfied in this case. Under the plea offer, Defendant would have plead guilty to two counts of murder-for-hire and faced a sentencing range of 151 to 188 months, with the ability to argue for the lower end of that range at sentencing. "Having to stand trial, not choosing to waive it," *Lafler*, 132 S. Ct. at 1385, because of ineffective assistance of counsel (as discussed above), Defendant was convicted on ten counts of murder-for-hire and four counts of witness tampering and, as a result, is now facing a

---

[15] Frustrated with the implications of entertaining such hypotheticals, the Government's position appears quite close to Justice Scalia's in writing for the dissent in *Frye*:

> Prejudice is to be determined, the Court tells us, by a process of retrospective crystal-ball gazing posing as legal analysis. First of all, of course, we must estimate whether the defendant *would have accepted* the earlier plea bargain. Here that seems an easy question, but as the Court acknowledges . . . it will not always be. Next, since Missouri, like other States, permits accepted plea offers to be withdrawn by the prosecution (a reality which alone should suffice, one would think, to demonstrate that Frye had no entitlement to the plea bargain), we must estimate whether the prosecution *would have withdrawn* the plea offer. And finally, we must estimate whether the trial court *would have approved* the plea agreement. These last two estimations may seem easy in the present case, since Frye committed a new infraction before the hearing at which the agreement would have been presented; but they assuredly will not be easy in the mine run of cases.

132 S. Ct. at 1413 (Scalia, J., dissenting) (emphasis in original); *accord Lafler*, 132 S. Ct. at 1394 (Scalia, J., dissenting). Regardless of the merits or perceived merits of the dissent's reasoning, the court must follow the majority and does so here by entertaining these hypotheticals, concluding that Defendant has sufficiently shown prejudice under *Strickland* on that basis.

guideline range of 325 to 405 months, more than double his sentencing exposure under the plea offer. Defendant testified to the court's satisfaction, and the court accordingly finds a reasonable probability, that he would have accepted the plea offer if the material terms had been presented to him and if he had benefitted from a correct understanding of the government's burden at trial and thus had a clearer picture of his chances of success at trial.

The Government argued in some detail about the perplexities within the U.S. Attorney's Office surrounding whether the plea offer Ms. Travis made was a "firm offer" that could satisfy the remaining speculative queries discussed in *Lafler* and outlined above. The court notes the colloquial use of the term "plea offer" that, to layperson and non-specialist lawyer alike, would appear to refer to an offer that a Defendant can accept and rely on. Complicating the issue, apparently in an attempt to clarify the U.S. Attorney's Office's in-house use of the term "offer," Mr. Esqueda testified that "we use the term offer to mean something that is set in stone or during the negotiations of a case." (Tr. Ev. Hrg. Dec. 7, 2012, at 149 [Dkt. No. 328].) In other words, when an Assistant U.S. Attorney uses the word "offer," in the view of the U.S. Attorney's Office, the Assistant U.S. Attorney is either referring to a "firm offer" that is "set in stone," meaning that it has been vetted and authorized by the Office's internal Screening Committee, or the Assistant U.S. Attorney is referring to a tentative "offer" used "during the negotiations of a case." Mr. Esqueda reiterated that "the term offer could mean one of two things, a formal plea offer, or the beginnings or the ongoing negotiations of a particular case." (*Id.* at 154.) Neither Mr. Esqueda nor Ms. Travis, in their testimony, delineated how a defendant, defense counsel, or the public at large would be able to tell the difference between the Assistant U.S. Attorney's different uses of the word "offer" in a given instance.

The court need not wade into the complexity of the uses of "offer" or "firm offer" or the applicable contract principles that govern plea offers at this time because the proffered testimony allays any concerns it would have about whether the plea offer would have taken effect had the Defendant accepted it.[16] The Supreme Court has held that "[i]n order to complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Frye*, 132 S. Ct. at 1410. It is true that Ms. Travis helpfully added in the plea offer email a disclaimer that she did not have final authority, and that the plea offer, should Defendant accept it, would be subject to review and final authorization by the Screening Committee. And the court agrees that from a contract perspective Ms. Travis's follow-up email of December 8, 2010 must be read in conjunction with the initial plea offer email and thus subject to the same disclaimer. But Defendant does not appear to have received that email and, in any event, Mr. Leigh did not discuss this with him. More importantly, however, Ms. Travis—one of the most senior and experienced Assistant U.S. Attorneys in the Office—testified that it is not her practice to propose a plea offer to defense counsel that she is not already confident the Screening Committee will accept. Moreover, she vetted the plea offer with Mr. Esqueda—one of the five members of the Screening Committee—who viewed the range presented in it as a

---

[16] The court is also persuaded by Defendant's argument that "[i]t is submitted that even if a firm offer is not conveyed to defense counsel, when the government indicates it is willing to negotiate a resolution in a case, defense counsel has a duty to engage in the negotiation process. Counsel can be constitutionally ineffective in the plea negotiation process if they fail to convey to the defendant the government's articulated willingness to resolve a case by negotiation or have proposed a resolution to the case." (Def.'s Mem. Supp. Mot. Compel 23 [Dkt. No. 332].) This reasoning is consistent with the language and implications of *Frye* and *Lafler*: "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, 132 S. Ct. at 1407; *accord Lafler* at 1384.

"substantial sentence" and the plea offer as a whole to be "worthy of presenting to the Screening Committee" as long as the mechanisms of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure were in place. (Tr. Ev. Hrg. Dec. 7, 2012, at 151 [Dkt. No. 328].)

Ms. Travis further testified that, with Mr. Esqueda's implicit sign-off (he testified that in the end he left it up to Ms. Travis to decide if she wanted to proceed with making the plea offer to defense counsel), she would have drafted a memorandum for the Screening Committee presenting the offer for final approval if Defendant had accepted the plea offer. The court acknowledges Mr. Esqueda's testimony that, although he personally viewed the sentence range as substantial and the plea offer as acceptable, he thought there was a chance that the Screening Committee as a whole might think the proposed sentencing range was too low. But Ms. Travis's testimony that she would not present a plea offer that she was not confident the Screening Committee would accept and would not draft a memorandum for submission to the Screening Committee (which she said she would have done in this case if Defendant had accepted the plea offer) if she did not think that a plea was acceptable convinces the court that there is at least a reasonable probability that the Government would have accepted its own plea offer to Defendant.[17]

The court also finds that it would have accepted the plea offer had it been presented to the court as having been accepted by both Defendant and the Government, particularly in light of the mechanics of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, including, primarily, the Defendant's waiver of his right to appeal.

---

[17] The *Frye* Court explained that "[i]t can be assumed that in most jurisdictions prosecutors and judges are familiar with the boundaries of acceptable plea bargains and sentences. So in most instances it should not be difficult to make an objective assessment as to whether or not a particular fact or intervening circumstance would suffice, in the normal course, to cause prosecutorial withdrawal or judicial nonapproval of a plea bargain. The determination that there is or is not a reasonable probability that the outcome of the proceeding would have been different absent counsel's errors can be conducted within that framework." 132 S. Ct. at 1410.

Although the Government might prefer that Justice Scalia's reasoning for the dissent in both *Frye* and *Lafler* had carried the day, the majority in both of those cases outlined an analysis of hypotheticals that this court must undertake. The outcome of that analysis, under the facts of this case, leads the court to find that defense counsel's constitutionally defective performance in the plea negotiations prejudiced Defendant under the *Strickland* standard.

**D.      Remedy**

Following the guidance in *Lafler*, once "a defendant shows ineffective assistance of counsel has caused the rejection of a plea leading to a trial and a more severe sentence," the court must address the question of "what constitutes an appropriate remedy." 132 S. Ct. at 1388. "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. Thus, a remedy must neutralize the taint of a constitutional violation while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Id.* at 1388-89 (internal quotation marks and citations omitted). For the circumstances in which ineffective assistance of counsel has led to a defendant's prejudicial rejection of a plea offer, as here, the *Lafler* court outlined the envisioned potential remedies:

> The specific injury suffered by defendants who decline a plea offer as a result of ineffective assistance of counsel and then receive a greater sentence as a result of trial can come in at least one of two forms. In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. This is typically the case when the charges that would have been admitted as part of the plea bargain are the same as the charges the defendant was convicted of after trial. In this situation the court may conduct an evidentiary hearing to determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea. If the showing is made, the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between.

> In some situations it may be that resentencing alone will not be full redress for the constitutional injury. If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a mandatory sentence confines a judge's sentencing discretion after trial, a resentencing based on the conviction at trial may not suffice. In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal. Once this has occurred, the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed.

*Id.* at 1389 (internal citation omitted). Basically, the goal of the remedy is to put Defendant back in the position he would have been in if he had accepted the plea offer.

At oral argument, Defendant argued that both options are available to the court in this instance. The Government did not have a firm position on the question of remedies under *Lafler*. The court finds that under *Lafler* the first form of injury is not applicable in this case and therefore the first option is not available to the court. The second form of injury has occurred in this case because the Defendant, having rejected the plea offer based on trial counsel's constitutionally defective performance at the plea bargaining stage, was convicted at trial on charges more serious than those to which he would have plead in the plea offer, and applicable mandatory sentences apply to Defendant's post-conviction sentencing guidelines. Accordingly, the court finds that the "proper exercise of discretion to remedy the constitutional injury" in this situation is "to require the prosecution to reoffer the plea proposal." *Id.*[18]

The court is aware that this is an example of a case in which "the rejection of the plea offer result[ed] in a substantial expenditure of scarce prosecutorial or judicial resources" because of the complex jury trial and numerous post-trial motions, including this one, which this court has needed to address despite its limited resources and substantial caseload. *Lafler*, 132 S. Ct. at

---

[18] In surveying the potential remedies outlined in *Lafler*, the court acknowledges Justice Scalia's concern that the remedy of compelling the Government "to reoffer the plea agreement" is "a remedy unheard-of in American jurisprudence—and, I would be willing to bet, in the jurisprudence of any other country." *Id.* at 1396 (Scalia, J., dissenting).

1399 (Alito, J., dissenting). But constrained as it is to follow the majority's holding, it has and will endeavor to "do so in a way that mitigates its potential to produce unjust results." *Id.*

## **CONCLUSION**

Based on the foregoing, the court GRANTS Defendant's Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the Defendant Due to Ineffective Assistance of Counsel [Dkt. No. 310]. Accordingly, the court orders the Government to reoffer the proposed plea agreement dated December 7, 2010 (as modified on December 8, 2010). If Defendant accepts the plea offer, the convictions will be vacated and Defendant will appear for sentencing consistent with the plea offer.

SO ORDERED this 19th day of March, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge